**UNITED STATES of America, Petitioner,**

v.

**TYSON'S POULTRY, INC., Respondent.**

**UNITED STATES of America, Petitioner,**

v.

**PLUS POULTRY, INC., Respondent.**

Nos. 483, 484.

United States District Court
W. D. Arkansas,
Harrison Division.

April 9, 1963.

Charles M. Conway, U. S. Atty., E. A. Riddle, Asst. U. S. Atty., Fort Smith, Ark., for petitioner.

Russell Elrod, Siloam Springs, Ark., Hall & Sublett, Tulsa, Okl., for Plus Poultry.

Crouch, Blair & Cypert, Springdale, Ark., for Tyson's Poultry, Inc.

A. E. Townsend, Jr., Little Rock, Ark., amicus curiae.

JOHN E. MILLER, Chief Judge.

The petitioner seeks enforcement of subpoenas duces tecum against the respondents as live poultry dealers and handlers under the Packers and Stockyards Act, 1921, as amended, 7 U.S.C. § 181 et seq.

Section 218b of Title 7 U.S.C., defines the term "live poultry dealer" as: "[A]ny person engaged in the business of buying or selling live poultry in commerce for purposes of slaughter either on his own account or as the employee or agent of the vendor or purchaser."

Section 182(6) provides:

"The term 'commerce' means commerce between any State, Territory, or possession, or the District of Columbia, and any place outside thereof; or between points within the same State, Territory, or possession, or the District of Columbia, but through any place outside thereof; or within any Territory or possession, or the District of Columbia."

Section 183 of the same Title provides:

"For the purpose of this chapter (but not in anywise limiting the definition in section 182 of this title) a transaction in respect to any article shall be considered to be in commerce if such article is part of that current of commerce usual in the livestock and meat-packing industries, whereby livestock, meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, are sent from one State with the expectation that they will end their transit, after purchase, in another, including, in addition to cases within the above general description, all cases where purchase or sale is either for shipment to another State, or for slaughter of livestock within the State and the shipment outside the State of the products resulting from such slaughter. Articles normally in such current of commerce shall not be considered out of such current through resort being had to any means or device intended to remove transactions in respect thereto from the provisions of this chapter. For the purpose of this section the word 'State' includes Territory, the District of Columbia, possession of the United States, and foreign nation."

Section 192 of the same Title enumerates the following unlawful practices pertaining to live poultry dealers or handlers:

"It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to;

"(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or

"(b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or

"(c) Sell or otherwise transfer to or for any other packer, or any live poultry dealer or handler, or buy or otherwise receive from or for any other packer or any live poultry dealer or handler any article for the purpose or with the effect of apportioning the supply in commerce between any such packers, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly in commerce; or

"(d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or

"(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly

in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or

"(f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business in commerce, or (2) to apportion purchases or sales of any article in commerce, or (3) to manipulate or control prices in commerce; or

"(g) Conspire, combine, agree, or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivisions (a)–(d) or (e) of this section."

Section 222 of Title 7 U.S.C., makes the provisions of Sections 46 and 48–50 of Title 15 U.S.C., applicable to the jurisdiction, powers and duties of the Secretary in enforcing the provisions of the Packers and Stockyards Act, and further provides:

"The Secretary, in person or by such agents as he may designate, may prosecute any inquiry necessary to his duties under this chapter in any part of the United States."

Section 46(a), Title 15 U.S.C., provides:

"The commission shall also have power—

"(a) To gather and compile information concerning, and to investigate from time to time the organization, business, conduct, practices, and management of any corporation engaged in commerce, excepting banks and common carriers subject to the Act to regulate commerce, and its relation to other corporations and to individuals, associations, and partnerships."

Section 49 of the same Title provides in part:

" * * * the commission, or its duly authorized agent or agents, shall at all reasonable times have access to, for the purpose of examination, and the right to copy any documentary evidence of any corporation being investigated or proceeded against; and the commission shall have power to require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence relating to any matter under investigation. Any member of the commission may sign subpoenas, and members and examiners of the commission may administer oaths and affirmations, examine witnesses, and receive evidence.

"Such attendance of witnesses, and the production of such documentary evidence, may be required' from any place in the United States, at any designated place of hearing. And in case of disobedience to a subpoena the commission may invoke the aid of any court of the United States in requiring the attendance and testimony of witnesses and the production of documentary evidence.

"Any of the district courts of the United States within the jurisdiction of which such inquiry is carried on may, in case of contumacy or refusal to obey a subpoena issued to any corporation or other person, issue an order requiring such corporation or other person to appear before the commission, or to produce documentary evidence if so ordered, or to give evidence touching the matter in question; and any failure to obey such order of the court may be punished by such court as a contempt thereof."

In August, 1962, the Director of the Packers and Stockyards Division of the Agricultural Marketing Service of the United States Department of Agriculture, pursuant to authority delegated to him from the Secretary of Agriculture, caused preliminary investigations to be made, under the Act, of the poultry industry in Arkansas and of each respondent. Upon the basis of the information obtained in connection with such preliminary investigations, the Di-

rector determined that a more thorough investigation should be made of the poultry industry in Arkansas, and of the nature of the organization of each respondent, the acquisition and slaughtering of live poultry and the processing and sale of poultry and poultry products, to determine whether the operations of respondents, during the first nine months of 1962, were in compliance with the Act. In connection with such investigations, employees of the Packers and Stockyards Division requested each respondent to make certain records, relevant to those matters, available to them for examination, but respondents refused to make available the records requested. Thereupon, subpoenas duces tecum issued by the Director, pursuant to authority delegated to him under the Act from the Secretary of Agriculture, were duly served upon respondents, which stated:

"UNITED STATES DEPARTMENT OF AGRICULTURE

BEFORE THE SECRETARY OF AGRICULTURE

SUBPENA DUCES TECUM

"TO: Tyson's Poultry, Inc.
Springdale, Arkansas

"Tyson's Poultry, Inc., Springdale, Arkansas, a corporation, is hereby required to appear before Charles C. Sercer, Laurence L. Trampe, John J. Ronan, or other authorized representatives of the Secretary of Agriculture, at the place of business of Tyson's Poultry, Inc., Springdale, Arkansas, on the 22 day of October, 1962, at 10:00 A.M. of that day, and to produce, and give access to, at said time and place and for a reasonable time thereafter, for examination and copying by said Charles C. Sercer, Laurence L. Trampe, John J. Ronan, or other authorized representatives of the Secretary of Agriculture, the following documentary evidence for the period from January 1, 1962, through September 30, 1962:

"1. All records including written agreements and contracts, letters, telegrams, memoranda, instructions and correspondence sent, received, or used by your plant or company in connection with the acquisition of live poultry or poultry products by or for your firm.

"2. All records including USDA grading and inspection records made or used by or for your firm in connection with the slaughtering of live poultry and the processing of poultry and poultry products.

"3. All records made or used by your firm including inventories, general ledgers, canceled checks, cash journals, expense journals, bills of lading, freight bills, correspondence and memoranda in connection with the sale by your firm of poultry and poultry products.

"Such requirements are essential in connection with an investigation by the Secretary of Agriculture under the Packers and Stockyards Act, 1921, as amended (7 U.S.C. 181 et seq.), of the nature of the organization of your firm, the acquisition and slaughtering of live poultry and the processing and sale of poultry and poultry products, to determine whether the operations of Tyson's Poultry, Inc., during the said period were in compliance with said Act and the Regulations issued thereunder. The foregoing requirements are made pursuant to the provisions of Section 9 of the Federal Trade Commission Act (15 U.S.C. 49), which provisions, by virtue of Section 402 of the Packers and Stockyards Act (7 U.S.C. 222), are made applicable to the jurisdiction, powers and duties of the

Secretary of Agriculture in enforcing the provisions of the Packers and Stockyards Act and to any person subject to the provisions of such Act, whether or not a corporation.

"Fail not at your peril.

"Done at Washington, D. C. Oct. 12, 1962

"/s/ Clarence H. Girard Director

"Packers & Stockyards Division

"Agricultural Marketing Service."

The subpoena served on Plus Poultry, Inc., is identical with the above except for the name and address.

Since the respondents refused to comply with them, the petitioner then instituted the present actions seeking enforcement of the subpoenas duces tecum against respondents under the provisions of section 9 of the Federal Trade Commission Act (15 U.S.C. § 49), which is incorporated in and made a part of the Packers and Stockyards Act by section 402 of the latter Act (7 U.S.C. § 222), on January 25, 1963, by filing petitions to compel respondents to attend and produce documentary evidence. On the same date the court entered orders for the respondents to show cause why an order of this court should not issue requiring them to produce the papers, records, or like documents specified in the subpoenas duces tecum.

In their answers the respondents defend their refusal to comply with the subpoenas on the basis that: (1) they are not live poultry dealers within the meaning of the Act and therefore the Secretary of Agriculture does not have jurisdiction over them; (2) the subpoenas constitute unreasonable searches and seizures and the taking of property without due process of law contrary to the Fourth and Fifth Amendments of the Constitution of the United States; (3) the subpoenas are too broad because they cover documents relating to their intrastate and foreign export business which they assert is not subject to investigation or regulation under the Act,

and because the subpoenas cover certain documents, copies of which are already in the possession of the Secretary of Agriculture; and (4) no charge or complaint has been filed or entered against respondents and thus the issuance of the subpoenas was not authorized by law and the Secretary is without power or authority to make an investigation of respondents and their operations.

Since the above captioned cases involved basically the same issues, they were consolidated for hearing before this court on February 18, 1963. At the hearing testimony and documentary evidence were introduced on behalf of the petitioner and both respondents. Following the hearing the parties submitted written briefs and arguments, and with the consent of the court the Arkansas Poultry Federation submitted its brief amicus curiae in support of the views and positions of the respondents.

Since administrative agencies have been created by Congress and have sought to investigate the activities of private corporations engaged in interstate commerce, there has been a multitude of cases which have sought to define the authority of these administrative agencies to issue subpoenas duces tecum for the purpose of obtaining documentary evidence in furtherance of their investigations. The most troublesome question up until recent years has been a jurisdictional one, that is, to what extent must the district courts, as enforcement bodies, inquire into administrative authority to conduct investigations and issue subpoenas duces tecum. The earlier cases placed the burden upon the district court to decide all the merits of not only the enforcement of the subpoenas but the necessity of the investigation itself. However, in recent years there has been a trend away from the earlier position toward placing greater weight upon the administrative agency's determination of a necessity to issue subpoenas in furtherance of its particular investigation. In the recent case of Adams v. F. T. C., (Appeal No. 16,747), (1961) 296 F.2d 861, the Eighth Circuit

Court of Appeals analyzed the principal cases dealing with the questions at hand in the instant cases before this court, and has set out as a guide the issues or points that need be considered by the district courts in dealing with petitions to enforce subpoenas duces tecum issued by administrative agencies as empowered by the Federal Trade Commission Act, Title 15 U.S.C. § 49. Beginning at page 366 the court stated:

> "Section 9 of the Federal Trade Commission Act, Title 15, U.S.C.A. § 49, empowers the Commission to examine documentary evidence of any corporation being investigated or proceeded against, and to 'require by subpoena the attendance and testimony of witnesses and the production of all such documentary evidence *relating to any matter under investigation.*' (Emphasis supplied). This statutory authority was judicially determined to be similar to discovery proceedings afforded by the Federal Rules of Civil Procedure by the Supreme Court of the United States in Oklahoma Press Publishing Co. v. Walling, 327 U.S. 186, at page 216, 66 S.Ct. 494, at page 509, 90 L.Ed. 614, where the court stated:

> " 'The result therefore sustains the Administrator's position that his investigative function, in searching out violations with a view to securing enforcement of the Act, is essentially the same as the grand jury's, or the court's in issuing other pretrial orders for the discovery of evidence, and is governed by the same limitations. These are that he shall not act arbitrarily or in excess of his statutory authority, but this does not mean that his inquiry must be "limited * * * by forecasts of the probable result of the investigation * * *." '

> "The investigatory authority of an administrative agency is not without limitations. There is general unanimity among the courts that a subpoena meets the require-

ments for enforcement if the inquiry is (1) within the authority of the agency; (2) the demand is not too indefinite, and (3) the information sought is reasonably relevant." (Citing cases).

See also, United States v. Woerth (N.D. Iowa 1955) 130 F.Supp. 930, 942, aff'd sub nom. Woerth v. United States, (8 Cir.1956) 231 F.2d 822.

The first issue to be determined is the authority of the agency, in this case the Department of Agriculture, to conduct the inquiry or investigation of the respondents, or, as stated in other words in the leading case of Oklahoma Press Publishing Co. v. Walling, (1946) 327 U.S. 186, 66 S.Ct. 494, 90 L.Ed. 614, is there probability, in fact, of coverage as alleged by the petitioner?

██ The respondents deny that the agency in question has authority to conduct such an investigation concerning them, or that there is no probability of coverage of their activities as live poultry dealers under the applicable statutes for three reasons: (1) Their activities are not embraced within the legislative intent of the applicable statutes as amended; (2) their activities are not a part of interstate commerce; (3) no complaint or formal charge has been filed against them by an administrative agency.

In support of their first contention the respondents state that the legislation passed in 1935, which included the activities of live poultry dealers and handlers within the Packers and Stockyards Act of 1921, was directed solely toward regulation of the activities of live poultry dealers and handlers in and around Jersey City and New York City and other large metropolitan areas. Admittedly the bulk of the 1935 legislation dealt with the licensing of live poultry dealers and handlers in large metropolitan areas, 7 U.S.C. §§ 218a to 218d, and the only definition of "live poultry dealer" appears in Section 218b. However, the same amendment added the words "live poultry dealer" to certain other sections

of the Packers and Stockyards Act of 1921 (Title 7 U.S.C. § 181 et seq.) as well as to Section 192, quoted above, which enumerates specific unlawful practices on the part of packers and live poultry dealers applicable to all and not confined merely to those in the larger metropolitan areas.

This court is not impressed with the argument construing legislative intent based upon testimony before a Congressional committee which occurred nearly 30 years ago, for this sort of reasoning applies to judicial construction of recent legislation which the courts have not yet had the opportunity to interpret as to any of its particular applications. The main body of legislation involved in the present case, which is the Packers and Stockyards Act, has been subjected to extensive court interpretation, and its far-reaching application has been widely recognized. Yet, as pointed out by the court in the case of United States v. Woerth, (N.D. Iowa 1955) 130 F.Supp. 930, at page 936:

> "The Packers and Stockyards Act was enacted by Congress to remedy a number of undesirable practices which had arisen in connection with the buying and selling of livestock at the major stockyards. Stafford v. Wallace, 1922, 258 U.S. 495, 513, 42 S.Ct. 397, 66 L.Ed. 735, 23 A.L.R. 229. The object of the Act is stated by Chief Justice Taft as follows, at page 514 of 258 U.S., at page 401 of 42 S.Ct.:
>
> " 'The object to be secured by the act is the free and unburdened flow of live stock from the ranges and farms of the West and the Southwest through the great stockyards and slaughtering centers on the borders of that region, and thence in the form of meat products to the consuming cities of the country in the Middle West and East, or, still as live stock, to the feeding places and fattening farms in the Middle West or East for further preparation for the market.' "

In other words, the legislative intent of any progressive or reform legislation would more likely be motivated by specific abuses of great magnitude which would naturally occur in large metropolitan areas or commercial centers. Nevertheless, adequate control of these large centers of commercial activity must necessarily be extended into the grass roots areas in order to be effective, and it cannot be denied that the present administration of the Packers and Stockyards Act with respect to the handling and processing of livestock and meat products is far-reaching and not confined to large metropolitan areas alone.

Section 192 of Title 7 U.S.C., deals with *any* live poultry dealer or handler, which wording would negate the restriction of the applicability of the Act to licensed dealers only, which the respondents are not. See, United States v. C. & V. Poultry, Inc., (E.D.N.Y.1955) 132 F.Supp. 945.

As a further argument, respondents point out that the time lapse of nearly 30 years since the passage of the 1935 amendment, which added live poultry dealers and handlers to the coverage of the Packers and Stockyards Act, before the Department of Agriculture attempted to regulate and investigate the activities of unlicensed poultry dealers in general would indicate that the Department itself is doubtful of coverage due to the legislative intent behind the amendment at the time of passage and the wording of the statute itself. The court finds no merit to this line of argument, and a sufficient answer to this contention is found in the case of United States v. Morton Salt Co., (1950) 338 U.S. 632, 70 S.Ct. 357, 94 L.Ed. 401, in which the court stated beginning at page 647 of 338 U.S., at page 366 of 70 S.Ct.:

> " * * * Respondents also say that the present use of the asserted power is novel and unprecedented in Commission practice and introduces a new method of investigating compliance. Respondents are not with-

out statements by the Commission or its officials, dicta from judicial opinions, views of text writers and facts of legislative history which give some support to this theory. But this Court never before has been called upon to deal consciously and squarely with the subject.

"The fact that powers long have been unexercised well may call for close scrutiny as to whether they exist; but if granted, they are not lost by being allowed to lie dormant, any more than nonexistent powers can be prescripted by an unchallenged exercise. We know that unquestioned powers are sometimes unexercised from lack of funds, motive of expediency, or the competition of more immediately important concerns. We find no basis for holding that any power ever granted to the Trade Commission has been forfeited by nonuser."

■ Respondents' second contention for denying probability of coverage under the legislation in question is that their commercial activities are not carried out as a part of interstate commerce, but are intrastate in nature only, and therefore the burden is upon the petitioner to prove otherwise before this court allow it to proceed with its investigation by enforcing its subpoenas duces tecum. Once again this argument must fail, for one of the primary purposes of the investigation itself, as evidenced by the wording of the subpoenas duces tecum served upon the respondents, is to obtain documentary evidence which would aid in determining this very question of whether the activities of the respondents are carried on in interstate and foreign commerce; and it is not for this court to decide the commerce question at this stage of the proceedings.

■ The relevant facts adduced from the testimony and exhibits introduced at the hearing disclosed that respondent, Plus Poultry, Inc., submitted a report to the Packers and Stockyards Division dated February 15, 1962, which indicated that during the previous 12 months the firm purchased outside the State of Arkansas 1,630,883 pounds of live poultry for slaughter in Arkansas, and that during that period the firm shipped 27,391,239 pounds of poultry products interstate out of a total production of 28,514,712 pounds. Mr. M. A. Simmons, President of Plus Poultry, Inc., testified that he assumed the purchases covered by the report referred to poultry acquired from Oklahoma from Watts Grain Company, Inc., an Oklahoma corporation, and that respondent did not purchase any live poultry outside of Arkansas during the last 12 months from any source other than Watts Grain Company, Inc. Mr. Simmons owns all of the stock of the respondent Plus Poultry, Inc., as well as all of the stock of Watts Grain Company, Inc.

As to respondent Tyson's Poultry, Inc., the evidence shows that it purchases its live poultry in Arkansas from Poultry Growers, Inc., its affiliated corporation. The same persons own and operate respondent and Poultry Growers, Inc. Mr. Don Tyson, Vice President of respondent Tyson's Poultry, Inc., testified that Poultry Growers, Inc., produces, through arrangements with about 400 farmers, approximately 99 percent of its poultry in Arkansas and approximately one percent in Missouri, and that Poultry Growers, Inc., sells live poultry to packers in Oklahoma and Missouri as well as in Arkansas. It appears, therefore, that Poultry Growers, Inc., is also a live poultry dealer as defined in the Act by virtue of such sales of poultry in commerce. Mr. Tyson did not deny that some of the poultry respondent Tyson's Poultry, Inc., purchases comes from Missouri.

Therefore, it is apparent that the petitioner has sustained its burden by showing probability of coverage from an interstate commerce standpoint when the facts are compared with the wording of the above quoted statute, which covers not only commercial activities which are a part of interstate commerce but also those activities which are a part of that *current* of interstate commerce

usual in the meat-packing and poultry industries. 7 U.S.C. § 183. See, United States v. Darby, (1941) 312 U.S. 100, 125, 61 S.Ct. 451, 85 L.Ed. 609.

The respondents and the amicus curiae, the Arkansas Poultry Federation, have relied heavily upon the opinion in the case of Crafts v. Federal Trade Commission, (9 Cir.1957) 244 F.2d 882, in support of the proposition that the district courts must decide the authority of the agency to demand documentary evidence by issuance of a subpoena duces tecum in furtherance of an investigation as a justiciable issue and that it is not sufficient for the agency itself to determine the probable coverage of the object of its investigation or its authority to investigate under the applicable statutes. This case was reversed by a per curiam decision of the United States Supreme Court in 1957 at 355 U.S. 9, 78 S.Ct. 33, 2 L.Ed.2d 23 and rehearing was denied at 355 U.S. 885, 78 S.Ct. 146, 2 L.Ed.2d 115. The respondents and the amicus curiae, in adopting the reasoning of the Ninth Circuit Court of Appeals in the Crafts case, apparently failed to negotiate the pitfall pointed out in the case of F.T.C. v. Hunt Foods and Industries, Inc., (S.D.Cal.1959) 178 F.Supp. 448, aff'd 9 Cir., 286 F.2d 803, in which the court stated at page 455:

"Most of the cases pointing the other way are early cases in which the courts, faced with a newly created commission empowered to exercise great controls in order to keep our economy free and competitive, sought to restrict it. Whatever validity these cases had is attenuated by later decisions. Trial courts must accept this situation, i. e., we must be guided not by some expression of higher courts *in an old case,* but by their *latest* expressions in the field, whether there be ideally logical consistency or not between the two lines of thought. * * * "

Turning to the more recent decisions of the United States Supreme Court, which have defined an agency's authority to conduct an investigation and seek enforcement of its subpoenas duces tecum in the district courts, the court in the case of Endicott Johnson Corp. v. Perkins, (1943) 317 U.S. 501, 63 S.Ct. 339, 87 L.Ed. 424, stated beginning at page 508 of 317 U.S., at page 342 of 63 S.Ct.:

"Of course another indispensable element of violation is that the underpaid employee be included within the benefits of the Act and contracts. This, too, was a matter under investigation in the administrative proceeding. But because she sought evidence of underpayment before she made a decision on the question of coverage and alleged that she 'had reason to believe' the employees in question were covered, the District Court refused to order its production, tried the issue of coverage itself, and decided it against the Secretary. This ruling would require the Secretary, in order to get evidence of violation, either to allege she had decided the issue of coverage before the hearing or to sever the issues for separate hearing and decision. The former would be of dubious propriety, and the latter of doubtful practicality. The Secretary is given no power to investigate mere coverage, as such, or to make findings thereon except as incident to trial of the issue of violation. No doubt she would have discretion to take up the issues of coverage for separate and earlier trial if she saw fit. Or, in a case such as the one revealed by the pleadings in this one, she might find it advisable to begin by examining the payroll, for if there were no underpayments found, the issue of coverage would be academic. On the admitted facts of the case, the District Court had no authority to control her procedure or to condition enforcement of her subpoenas upon her first reaching and announcing a decision on some of the issues in her administrative proceeding.

"Nor was the District Court authorized to decide the question of coverage itself. The evidence sought by the subpoena was not plainly incompetent or irrelevant to any lawful purpose of the Secretary in the discharge of her duties under the Act, and it was the duty of the District Court to order its production for the Secretary's consideration. The Secretary may take the same view of the evidence that the District Court did, or she may not. The consequence of the action of the District Court was to disable the Secretary from rendering a complete decision on the alleged violation as Congress had directed her to do, and that decision was stated by the Act to be conclusive as to matters of fact for purposes of the award of government contracts. Congress sought to have the procurement officers advised by the experience and discretion of the Secretary rather than of the District Court. To perform her function she must draw inferences and make findings from the same conflicting materials that the District Court considered in anticipating and foreclosing her conclusions."

In the leading case of Oklahoma Press Publishing Co. v. Walling, supra, the court stated at page 214 of 327 U.S., at page 508 of 66 S.Ct.:

"We think, therefore, that the courts of appeals were correct in the view that Congress has authorized the Administrator, rather than the district courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations; in doing so to exercise his subpoena power for securing evidence upon that question, by seeking the production of petitioners' relevant books, records and papers; and, in case of refusal to obey his subpoena, issued according to the statute's authorization, to have the aid of the district court in enforcing it.

No constitutional provision forbids Congress to do this. On the contrary, its authority would seem clearly to be comprehended in the 'necessary and proper' clause, as incidental to both its general legislative and its investigative powers."

In the case of United States v. Morton Salt Co., supra, the court stated beginning at page 640 of 338 U.S., at page 362 of 70 S.Ct.:

"The Trade Commission Act is one of several in which Congress, to make its policy effective, has relied upon the initiative of administrative officials and the flexibility of the administrative process. Its agencies are provided with staffs to institute proceedings and to follow up decrees and police their obedience. While that process at times is adversary, it also at times is inquisitorial. These agencies are expected to ascertain when and against whom proceedings should be set in motion and to take the lead in following through to effective results. It is expected that this combination of duty and power always will result in earnest and eager action but it is feared that it may sometimes result in harsh and overzealous action.

"To protect against mistaken or arbitrary orders, judicial review is provided. Its function is dispassionate and disinterested adjudication, unmixed with any concern as to the success of either prosecution or defense. Courts are not expected to start wheels moving or to follow up judgments. Courts neither have, nor need, sleuths to dig up evidence, staffs to analyze reports, or personnel to prepare prosecutions for contempts. Indeed, while some situations force the judge to pass on contempt issues which he himself raises, it is to be regretted whenever a court in any sense must become prosecutor. Those occasions should not be needlessly multiplied by denying investigative and

prosecutive powers to other lawful agencies.

\*   \*   \*   \*   \*   \*

"The only power that is involved here is the power to get information from those who best can give it and who are most interested in not doing so. Because judicial power is reluctant if not unable to summon evidence until it is shown to be relevant to issues in litigation, it does not follow that an administrative agency charged with seeing that the laws are enforced may not have and exercise powers of original inquiry. It has a power of inquisition, if one chooses to call it that, which is not derived from the judicial function. It is more analogous to the Grand Jury, which does not depend on a case or controversy for power to get evidence but can investigate merely on suspicion that the law is being violated, or even just because it wants assurance that it is not. When investigative and accusatory duties are delegated by statute to an administrative body, it, too, may take steps to inform itself as to whether there is probable violation of the law."

Therefore, the court is of the opinion that the petitioner has sustained its burden of showing probability of coverage of the respondents' activities in light of the applicable statutes and the subpoenas which clearly set forth the nature and purpose of the investigation; and this court will not look further in order to inquire into the merits of the question of actual coverage itself or the probability of a violation of law actually having occurred.

■ As their third reason for denying the petitioner's authority to issue a subpoena duces tecum, the respondents contend that no complaint or formal charges have been filed against them. There is no basis for this contention, for the rationale of allowing an agency to serve subpoenas duces tecum in furtherance of its investigatory powers is to determine the need for filing a complaint or formal charges. As stated by the court in Oklahoma Press Publishing Co. v. Walling, supra, at page 201 of 327 U.S., at page 501 of 66 S.Ct.:

" * * * The very purpose of the subpoena and of the order, as of the authorized investigation, is to discover and procure evidence, not to prove a pending charge or complaint, but upon which to make one if, in the Administrator's judgment, the facts thus discovered should justify doing so.

" * * * For to deny the validity of the orders would be in effect to deny not only Congress' power to enact the provisions sustaining them, but also its authority to delegate effective power to investigate violations of its own laws, if not perhaps also its own power to make such investigations."

The court further stated, beginning at page 208 of 327 U.S., at page 505 of 66 S.Ct.:

" * * * It is not necessary, as in the case of a warrant, that a specific charge or complaint of violation of law be pending or that the order be made pursuant to one. It is enough that the investigation be for a lawfully authorized purpose, within the power of Congress to command."

See: United States v. C. & V. Poultry, Inc., supra; and United States v. Woerth, supra.

Although not mentioned in respondents' briefs, they have alleged in their answers that the subpoenas duces tecum were issued in violation of the Administrative Procedure Act. This Act was passed in 1946 after the Endicott Johnson and Oklahoma Press Publishing cases were decided, but in the case of Tobin v. Banks & Rumbaugh, (5 Cir. 1953) 201 F.2d 223, the court, in holding that the Administrative Procedure Act did not alter pre-existing law, stated at page 226:

" * * * There is nothing in the Administrative Procedure Act which

suggests that the duty and burden of determining the question of coverage in the first instance was intended to be shifted from the administrative agency to the courts. To give effect to appellee's contention would, in most instances, sterilize the investigative powers of the Administrator and force him to trial without the benefit of the very evidence which the subpoena is designed to secure. Refusal of the courts to refrain from adjudicating the issue of coverage in the enforcement proceeding would result in a maelstrom of confusion, for by their refusal to permit investigation, employers would be enabled to secure a premature judgment on that issue and the very evil which Congress sought to overcome would prevail over the guardian appointed to correct it."

The second main issue to be considered is whether the demand of the petitioner is too indefinite. The respondents, basing their contention upon the wording of Justice Holmes' opinion in the case of Federal Trade Commission v. American Tobacco Co., (1924) 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, and the decisions of circuit courts of appeal during the same period, contend that the subpoenas fail to meet the requirements for enforcement because the demands constitute unreasonable searches and seizures and taking of property without due process of law contrary to the Fourth and Fifth Amendments to the United States Constitution, the demands are too broad in that they cover documents relating to intrastate and foreign export business and are otherwise indefinite; the demands are too burdensome in that they are extensive and even cover certain documents, the copies of which are already in possession of the petitioner; and, in general, the demands constitute nothing more than a "fishing expedition."

The most thorough analysis of the rule of the American Tobacco case in the context of the present law is found in the opinion of Judge Graven in the case of United States v. Woerth, supra, in which he stated, beginning 130 F.Supp. at page 940

"The American Tobacco Company case, supra, is a leading and often cited case in this area of unreasonable searches and seizures. The petition for a writ of mandamus by the Federal Trade Commission alleged unfair discrimination by the respondents. In his opinion denying the writs Justice Holmes said, at pages 305, 306 of 264 U.S., at page 337 of 44 S.Ct.:

" ' * * * Anyone who respects the spirit as well as the letter of the Fourth Amendment would be loath to believe that Congress intended to authorize one of its subordinate agencies to sweep all our traditions into the fire * * *, and to direct fishing expeditions into private papers on the possibility that they may disclose evidence of crime. * * *

" ' * * * The analogies of the law do not allow the party wanting evidence to call for all documents in order to see if they do not contain it. Some ground must be shown for supposing that the documents called for do contain it. * * * Some evidence of the materiality of the papers demanded must be produced * * *.'

"From the above discussed cases it would appear that a major objection to the enforcing of the subpoenas was their lack of specificity. See also, Hale v. Henkel, 1906, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652. In each case there was a large number of records demanded. To produce them all would have been a burdensome task. It was quite evident that large amounts of the material demanded was irrelevant. In referring to situations where the subpoena calls for a mass of documents, Justice Holmes in the American Tobacco Company case, supra,

said, at page 307 of 264 U.S., at page 337 of 44 S.Ct.:

"'* * * We assume for present purposes that even some part of the presumably large mass of papers relating only to intrastate business may be so connected with charges of unfair competition in interstate matters as to be relevant, Stafford v. Wallace, 258 U.S. 495, 520, 521, 42 S.Ct. 397, 66 L.Ed. 735, but that possibility does not warrant a demand for the whole. * * *'

"* * * In the case of United States v. Medical Soc. of District of Columbia, D.C.1938, 26 F.Supp. 55, the problem of the reasonableness of the subpoena was considered. The Court concluded that the subpoena must cover only a reasonable time and must specify with reasonable particularity the subjects to which the desired writings relate. With this in mind the Court held certain parts of the subpoena unreasonable. However, that part of the subpoena calling for all 'minutes, letters, telegrams, correspondence, messages, memoranda, reports, notes, or other documents, made, written, sent, or received' covering a period of some six years and relating to certain of the defendant's activities was held not to be unreasonable. The Court felt the time involved in the request was not unreasonable and that the search for the documents could be made without great difficulty.

"Judge Learned Hand aptly commented on this problem of unreasonable search and seizure in the case of McMann v. Securities and Exchange Commission, supra, [2 Cir., 87 F.2d 377, 109 A.L.R. 1445], when he said, at page 379 of 87 F.2d:

"'* * * No doubt a subpoena may be so onerous as to constitute an unreasonable search. Hale v. Henkel, 201 U.S. 43, 26 S.Ct. 370, 50 L.Ed. 652; Federal Trade Commission v. American Tobacco Company, 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696, 32 A.L.R. 786. Even then, the sanction is unobjectionable, unlike a descent upon one's dwelling or the seizure of one's papers; the search is "unreasonable" only because it is out of proportion to the end sought, as when the person served is required to fetch all his books at once to an exploratory investigation whose purposes and limits can be determined only as it proceeds. The investigation at bar was no such "fishing excursion," * * *. The documents demanded were few and their production did not interfere with the business of Engel & Company. There was no oppression, or evidence of any other motive than a lawful investigation. Unless such subpoenas are valid, it is impossible to see how the statutes can be enforced at all, or how any wrongdoer can be brought to book.'"

The case of Oklahoma Press Publishing Co., supra, decided the Fourth Amendment problem at page 195 of 327 U.S., at page 498 of 66 S.Ct.:

"The short answer to the Fourth Amendment objections is that the records in these cases present no question of actual search and seizure, but raise only the question whether orders of court for the production of specified records have been validly made; and no sufficient showing appears to justify setting them aside. No officer or other person has sought to enter petitioners' premises against their will, to search them, or to seize or examine their books, records or papers without their assent, otherwise than pursuant to orders of court authorized by law and made after adequate opportunity to present objections, which in fact were made. * * *

"What petitioners seek is not to prevent an unlawful search and seizure. It is rather a total immunity to the Act's provisions, applicable to all others similarly situated, requiring them to submit their pertinent records for the Administrator's inspection under every judicial

safeguard, after and only after an order of court made pursuant to and in exact compliance with authority granted by Congress. This broad claim of immunity no doubt is induced by petitioners' First Amendment contentions. But beyond them it is rested also upon conceptions of the Fourth Amendment equally lacking in merit.

"Petitioners' plea that the Fourth Amendment places them so far above the law that they are beyond the reach of congressional and judicial power as those powers have been exerted here only raises the ghost of controversy long since settled adversely to their claim. * * "

See: United States v. Morton Salt Co., supra, 338 U.S. at page 651, 70 S.Ct. at page 368.

The general rule to guide the district courts in deciding whether the demand of a subpoena is too indefinite or unreasonable is set out in the case of Adams v. F. T. C., supra, 296 F.2d at page 866:

"If it is made to appear that the demand is too indefinite or that the data sought is not reasonably relevant, the agency action is generally regarded as being unreasonable and arbitrary, and the courts will deny enforcement. As stated in the Cohn case, supra [Federal Communications Commission v. Cohn, D.C., 154 F.Supp. 899], 'Of course the subpoena power must at all times be confined to "the rudimentary principles of justice," and the courts will plainly refuse to enforce an administrative subpoena which is not within the bounds of reasonableness.' 154 F.Supp. 908. 'The process is lawful if it confines its requirements within the limits which reason imposes in the circumstances of the particular case.' McGarry et al. v. Securities and Exchange Commission, supra [10 Cir., 147 F.2d 389], 147 F.2d at p. 392.

"Initially the administrative agency must exercise its discretion in determining what information it will require in making the investigation, but when the jurisdiction of the court is invoked in an enforcement proceeding, it must be judicially determined whether the agency abused its discretion; in other words, the court must determine whether the subpoena power has been confined to the rudimentary principles of justice. Federal Communications Commission v. Cohn, supra; McGarry et al. v. Securities and Exchange Commission, supra; cf. Walling v. American Rolbal Corporation, supra [2 Cir., 135 F.2d 1003]."

Turning to the facts in the instant cases, there is no evidence that the demands of the subpoenas constitute unreasonable searches and seizures and taking of property without due process of law contrary to the Fourth and Fifth Amendments, because the scope of the demand is contained within the ambit of the applicable legislation and the respondents are protected by the requirement of due process at every stage of the proceedings, one stage of which is institution of the instant actions. As pointed out in the above cited cases, those persons who object to the demands of subpoenas are entitled to judicial review of the administrative proceedings as a matter of right, and at that time they may raise the appropriate constitutional questions. Title 15 U.S.C. § 49, protects natural persons from self-incrimination from the outset. The objection that the demands relate to intrastate and foreign commerce are not valid, for the cases cited above and the clear wording of Sec. 183 of Title 7 U.S.C., extends the authority of the Department of Agriculture to investigate where foreign commerce is concerned, and qualified authority in the case of intrastate commerce which is a part of the current of interstate commerce when such investigation will throw light on the over-all picture of activities carried on within interstate commerce. The demands are not too burdensome, for they

specify documents not in current use which cover a nine-month period of the year of 1962 ending in September, and any inconvenience on the part of the respondents will be at a minimum, either in loss of space or in man-hours required to collect and copy the records and documents demanded. The fact that the petitioner has copies of certain records and documents that it is demanding is not sufficient to sustain an objection, for it has been asserted by the petitioner that it is necessary to the furtherance of the investigation to have access to all records kept by respondents so that they may be compared with those already in possession of the petitioner in order to determine the correctness of all copies and to examine any additional notations added by the respondents to the copies in their possession. The term "fishing expedition" as a characterization of any such investigation has lost its impact during passage of years since that phrase appeared in the American Tobacco case, supra, and it is incumbent upon any person objecting to the demands of subpoenas as those issued in the instant case to be more specific in their objections.

Any lingering apprehension on the part of the respondents should be allayed by the following statement of the United States Supreme Court in the Oklahoma Press Publishing case, supra, at page 217 of 327 U.S., at page 510, of 66 S.Ct.:

"Petitioners stress that enforcement will subject them to inconvenience, expense and harassment. That argument is answered fully by what was said in Myers v. Bethlehem [Shipbuilding] Corp. [303 U.S. 41, 58 S.Ct. 459, 82 L.Ed. 638]. There is no harassment when the subpoena is issued and enforced according to law. The Administrator is authorized to enter and inspect, but the Act makes his right to do so subject in all cases to judicial supervision. Persons from whom he seeks relevant information are not required to submit to his demand, if

in any respect it is unreasonable or overreaches the authority Congress has given. To it they may make 'appropriate defence' surrounded by every safeguard of judicial restraint. In view of these safeguards, the expressed fears of unwarranted intrusions upon personal liberty are effective only to recall Mr. Justice Cardozo's reply to the same exaggerated forebodings in Jones v. Securities & Exchange Commission [298 U.S. 1, 56 S.Ct. 654, 80 L.Ed. 1015]: 'Historians may find hyperbole in the sanguinary simile.'"

Since the court is of the opinion that the demands of the subpoenas duces tecum at issue in the instant cases are not indefinite, burdensome, unreasonable or constitute an abuse of administrative discretion, the objections of the respondents on those grounds are without merit.

█ The third main issue concerning the question of whether the information sought is reasonably relevant is closely connected with the second main issue discussed above, and the authorities quoted above have considered these two issues as one, more often than not.

The general rule in this connection is set out in the case of United States v. Woerth, supra, at page 942 of 130 F. Supp., where the court stated that the government has the responsibility of offering evidence to show that the information sought by the subpoena was relevant, yet, the agency's determination that the information is relevant is entitled to a prima facie stamp of correctness by the courts. The court in the Oklahoma Press Publishing case, supra, reduced the criterion to be met by the petitioner to simple terms. The purpose of an inquiry as in the instant cases is to determine two issues, whether respondents are subject to the legislation in question and, if so, whether they are violating it. The records sought by the subpoenas are relevant to the authorized inquiry if the information requested will throw light on the above two issues. (327 U.S. at page 210, 66 S.Ct. at page 506).

 

Turning to the wording of the subpoenas in the instant cases, it is apparent that they demand records covering a nine-month period from January 1 to September 30, 1962, which fall into three general categories: (1) all records, documents, etc., sent, received or used by respondents in connection with the acquisition of live poultry or poultry products; (2) all records, documents, etc., made or used by respondents in connection with the slaughtering of live poultry and the processing of poultry and poultry products; and (3) all records, documents, etc., in connection with the sales by the respondents of poultry and poultry products. In other words, with the information demanded by the subpoenas in question, the Department of Agriculture seeks to determine for purposes of its investigation, first, whether the respondents were live poultry dealers within the meaning of the applicable legislation; second, whether their activities as live poultry dealers were carried on in interstate commerce or were a part of that current of interstate commerce usual in the particular industry within the meaning of the applicable legislation; and third, assuming that the respondents are live poultry dealers carrying on their activities in commerce subject to the provisions of the legislation in question, whether their activities constitute a violation of this legislation.

In view of the wording of the subpoenas in question and the applicable law, the court is convinced that the information sought by the subpoenas duces tecum issued and served by the Department of Agriculture was reasonably relevant.

In conclusion, the investigation in question is one authorized by Congress, and it is for a purpose within the power of Congress to authorize. The subpoenas duces tecum issued in furtherance of such investigation are not couched in broad and sweeping language, nor do they call for indefinite records or a mass of records. They are very specific and limited in their terms both as to the amount and type of records demanded and the period of time they are to cover. The production of the records called for by the subpoenas duces tecum will not disrupt or interfere with the respondents' business activities or place an undue burden on them or cause hardship to them. The subpoenas duces tecum in question were issued for the purpose of making such an investigation and call for the production of records which are apparently relevant thereto. Therefore it is the opinion of this court that the subpoenas duces tecum in question were valid and proper and that their demands should be enforced.

Therefore, an order is being entered today in each of the cases requiring respondents to appear before the Secretary of Agriculture of the United States or such officers or representatives designated by him, at such time and place to be determined by him, and there to produce the documentary evidence as required by the said subpoenas duces tecum.