UNITED STATES of America,
Appellant,

v.

MARSHALL DURBIN & CO. OF HALEY-
VILLE, INC., and Marshall Durbin
Broiler Production, Inc., Appellees.

No. 22415.

United States Court of Appeals
Fifth Circuit.

July 1, 1966.

Robert V. Zener, Alan S. Rosenthal, Attys., Dept. of Justice, Washington, D. C., Macon L. Weaver, U. S. Atty., John R. Thomas, Jr., Asst. U. S. Atty., Birmingham, Ala., for appellant.

L. Drew Redden, Birmingham, Ala., for appellees.

Before TUTTLE, Chief Judge, BELL, Circuit Judge, and KILKENNY,* District Judge.

* Of the District of Oregon, sitting by designation.

KILKENNY, District Judge:

We have for consideration the validity of certain subpoenas *duces tecum* issued by the Secretary of Agriculture under the provisions of the Packers and Stockyards Act, 7 U.S.C. § 181 et seq. Four actions are consolidated on this appeal. In two of these actions, defendants applied for orders quashing the service of the subpoenas; in the other two, the United States petitions for enforcement. After a hearing, the district court held that, except as to certain documents, the Secretary was not entitled to the information sought, denied enforcement and ordered the subpoenas quashed. Each subpoena sought information [1] for a period from January 1, 1962, to September 30, 1962.

Each subpoena directed to Marshall Durbin & Co. of Haleyville, Inc. (Haleyville) and to Marshall Durbin Broiler Production, Inc. (Broiler Production), recited that the requested documents were essential in connection with investigations then being conducted by the Secretary under the Packers and Stockyards Act in connection with (1) "the relationship of the organization and operations of (Haleyville, Broiler Production) and Marshall Durbin & Co. of Jasper * *, the acquisition and slaughtering of live poultry, and the processing and sale of poultry and poultry products by Marshall Durbin & Co. of Jasper * * * to determine whether the operations of Marshall Durbin & Co. of Jasper (Jasper) * * * during said period were in compliance with said Act;" and (2) "the organization and operations of (Haleyville, Broiler Production) and its acquisition and sale of live poultry, to determine whether its operations * * * were in compliance with said Act." In response to the subpoenas, Haleyville and Broiler Production stated that each purchased day-old chicks, raised such chicks to broilers, and sold the live broilers. The response challenged

the coverage by the Packers and Stockyards Act and the subpoena power of the Secretary.

Mr. Durbin was the sole witness at the hearing. From his testimony, we gather that Haleyville, Broiler Production and Jasper, were organizations closely held by the Durbin family with a substantial identity of stockholders, directors and officers. Jasper is a poultry processor. It buys live birds, slaughters the birds and sells the frozen poultry and various other poultry products. It sold between three and four million pounds of poultry products each month, its customers being located over a large segment of the United States, particularly east of the Allegheny Mountains. About 90% of the sales were outside the state of Alabama, Jasper's state of residence. Jasper purchased a substantial portion of its live poultry from Haleyville and Broiler Production, the corporations to which the subpoenas were directed. Substantially all of the broiler sales of Haleyville and Broiler Production were made to Jasper.

Haleyville and Broiler Production, each had written contracts with a number of farmers who were not employees of the companies, under which the farmers fed and tended the chickens until they reached broiler size. These were then sold to Jasper. Day old chicks were purchased by Haleyville and Broiler Production, transported to each of the farmers, with whom the company has "grow-out" contracts. It was Mr. Durbin's opinion that title to the chicks were at all times vested in Haleyville and Broiler Production and remained in these companies throughout the period the birds were in the hands of the farmers and until they were sold to Jasper. A number of questions propounded by Government counsel to Mr. Durbin were objected to by appellees' counsel. These questions related to the substance of the "grow-out" contracts,

---

1. "All records including written agreements and contracts, settlement sheets, scale tickets, cancelled checks, general ledgers, cash journals, expense journals, bills of lading, freight bills, letters, telegrams, memoranda, instructions and correspondence sent, received, or used by your company, in connection with the acquisition and sale of live poultry by or for your firm."

with reference to the subjects set forth in the footnote.[2] Although appellees' attorney refused to produce the contracts, he did offer to permit the court to view the contracts *en camera.* The court indicated that it was familiar with the general practice and custom in the industry, and did not need to view the documents. Counsel for appellees, although objecting to substantially all of the questions propounded by Government counsel, did permit certain answers by Mr. Durbin, to the effect that the farmers made the decision as to when the broilers would be sold to the processor, and that the "grow-out" contracts were in writing.

The district court held that neither Haleyville nor Broiler Production was within the coverage of the Packers and Stockyards Act, insofar as their "growing operations" were concerned. He felt that the corporations were producers or growers of poultry and were not "live poultry dealers" within the meaning of the Act. He took the position that the Act gave the Secretary regulatory power over processors and dealers, but not over producers and growers and, then concluded, that, " * * * there is no coverage or probability of coverage" under the Act of the "growing operation" of Haleyville and Broiler Production. The scope of the subpoenas was, therefore, limited by the court to records relating to the sale by Haleyville and Broiler Production of live poultry to Jasper. Additionally, the district court held that the language of the subpoenas did not reach records relating to the "growing operation."

(I) Exceptionally broad powers are granted by the Act to the Secretary, including the power to "prosecute any inquiry necessary to his duties under this chapter in any part of the United States." [3] His jurisdiction and powers are defined in the Federal Trade Commission Act, 15 U.S.C. § 49. His duties under the provisions of 7 U.S.C. § 218b and 7 U.S.C. § 192, include investigating the business transactions of a live poultry dealer which might violate the requirements of 7 U.S.C. § 192. The subpoenas issued in this case were directed to the records of the appellees on an investigation to determine if there had been violations of the Packers and Stockyards Act on the part of either the appellees, or their affiliate, Jasper. The investigation came to a standstill when the district court quashed the subpoenas.

■ That the district court passed on the very question which the Secretary intended to investigate and resolve is without question. In doing this, the court was in error. Its function was to decide whether there was a possibility that the subpoenaed material might be relevant to the Secretary's inquiry.

■ Obviously, the principal purpose of the Act is to protect producers and consumers of poultry against certain deleterious practices of middlemen. To effectuate this end, the Act [4] regulates the activities of live "poultry dealers."

■ Appellant's position, with which we agree, is that the evidence produced at the time of the hearing would indicate that the appellees might be subject to coverage by the Act. Consequently, the evidence sought by the subpoena is not plainly incompetent or irrelevant to the investigation then being conducted by the Secretary. Such being the case, it was the plain duty of the district court to order the production of the

2. "(1) On what basis are the farmers raising broilers for Haleyville and Broiler Production compensated?

(2) Do these farmers all receive the same compensation?

(3) When broilers are condemned at the processing plant, is there a chargeback to the farmer who actually raised the broilers, or do Haleyville and Broiler Production bear the risk of loss by condemnation?

(4) With how many farmers do Haleyville and Boiler Production have grow-out contracts?

(5) From whom do Haleyville and Broiler Production obtain the day-old chicks which they place with farmers for raising?"

3. 7 U.S.C. § 222.

4. 7 U.S.C. § 192.

documents for the Secretary's consideration. Endicott Johnson Corp. v. Perkins, 317 U.S. 501, 509, 63 S.Ct. 339, 87 L.Ed. 424 (1943). The logic employed in Oklahoma Press Pub. Co. v. Walling, 327 U.S. 186, 214, 66 S.Ct. 494, 508, 90 L.Ed. 614 (1946), holding, under the Fair Labor Standards Act, which incorporates, as does the Act before us, the provisions of Section 9 of the Federal Trade Commission Act, regarding the issuance and judicial enforcement of subpoenas, that "Congress * * * authorized the Administrator, rather than the District Courts in the first instance, to determine the question of coverage in the preliminary investigation of possibly existing violations * * *" is in full support of appellant's position. Appellees attempt, but fail, to find a substantial distinction between the facts before us and those presented in *Endicott Johnson* and *Oklahoma Press*. The argument that there is an entire lack of judicial supervision to protect appellees, indicates a failure to explore and analyze the applicable statute, 15 U.S.C. § 49, or the appropriate authorities, Flotill Prod., Inc. v. F. T. C., 278 F.2d 850 (9th Cir. 1960) and Hunt Foods & Industries, Inc. v. F. T. C., 286 F.2d 803, 811 (9th Cir. 1960), which outline protective measures that may be taken by the court on the enforcement of the subpoena. For that matter, the enforcement order is independent and supersedes the subpoena. Flotill Prod., Inc. v. F. T. C., supra. Without question, the district court, on enforcement, will protect appellees' rights. If the order is arbitrary, mistaken or mischievous, judicial review may be obtained. United States v. Morton Salt Co., 338 U.S. 632, 640, 70 S.Ct. 357, 94 L.Ed. 401 (1950); United States v. Tyson's Poultry Co., 216 F.Supp. 53, 63 (W.D.Ark.1963).

■ Appellees cannot be serious in urging that their activities do not meet the jurisdictional requirements of inter-state commerce. In any event, we find no merit in the contention. Neither can they invoke the rule stated in F. T. C. v. American Tobacco Co., 264 U.S. 298, 44 S.Ct. 336, 68 L.Ed. 696 (1924), that where a subpoena required the production of "all * * * records, relevant or irrelevant, in the hope that something will turn up" the language is too broad and the court will not require enforcement. The basis of that decision was the unreasonableness of the requirement to produce records "relevant or *irrelevant*." *Oklahoma Press*, supra 327 U.S. p. 207, 66 S.Ct. 494, footnote 40. The language of the subpoena before us does not require the production of "irrelevant" material. *American Tobacco Co.* has no application to the facts before us. —

■ Likewise, we believe there is merit in appellant's alternate theory that the subpoenas were enforceable even though the appellees were not subject to regulation under the Packers and Stockyards Act. On this theory, it is urged that under the Federal Trade Commission Act, the subpoena powers of which are incorporated in the Packers and Stockyards Act, the Secretary may subpoena records pertinent to an investigation, even though the subpoena is directed to a third person who is not the subject of such an investigation. The records covered by the subpoenas in this case are relevant to an investigation of Jasper. Consequently, it seems that the doctrine taught in Freeman v. Brown Bros. Harriman & Co., 250 F.Supp. 32 (S.D.N.Y. 1966), aff'd 357 F.2d 741 (2d Cir. 1966), and in Freeman v. Fidelity-Philadelphia Trust Co., 248 F.Supp. 487 (E.D.Pa. 1965), appeal pending,[5] permitting the Secretary of Agriculture, under 7 U.S.C. § 610(h)[6] to examine the records of banks which were admittedly not subject to the regulatory provisions of the Stockyards Act, would support appellant's position. In each of these cases, the court rejected the contention of the bank that its

---

5. The Court of Appeals for the Third Circuit has denied the bank's motion to stay enforcement of the subpoena pending appeal.

6. Practically identical with the language of § 402 of the Packers and Stockyards Act.

records were not subject to subpoena by the Secretary.

■ (II.) As an alternative, the trial court held that the subpoenas, even though valid, did not require the production of the "growing records." The alternative order precludes the Secretary from obtaining (1) records relating to the "grow-out" contracts, and (2) records relating to the appellees' acquisition of day-old chicks. Clearly, the latter type of record is covered by the subpoena, which required the production, among other things, of " * * * records * * * in connection with the acquisition * * * of live poultry." As previously stated, the record supports a finding that there may be some "connection" between transactions under the "grow-out" contracts and the sale of poultry to Jasper. Even assuming there is an ambiguity in the following language of the subpoenas "in connection with the acquisition and sale of live poultry," that ambiguity should be resolved in favor of coverage of the "grow-out" records for at least three reasons: first, the appellees, as shown by their application to quash the subpoenas, had no difficulty in understanding the scope of the language;[7] second, the documents sought were described in detail in the subpoenas. Mr. Durbin testified that most of these documents were involved in the appellees' "grow-out" operations. The "grow-out" contracts are written agreements. His testimony demonstrates that appellees had no difficulty in understanding that the subpoenas covered all "grow-out" records; third, the language of the subpoenas indicated that the inquiry was being made by the Secretary "to determine whether (appellees) operations * * * were in compliance with the (Packers and Stockyards) Act." This language would be meaningless unless it was read to cover the "grow-out" records.

■ (III.) Finally, appellees contend that the Secretary, rather than the Acting Director of the Packers and Stockyards Division, should have personally signed the subpoenas. While each appellee admitted in its pleadings that the subpoenas were issued and signed by "a duly acting and authorized representative" of the Secretary and subsequently admitted in open court that the subpoenas were "duly and regularly issued," and such admissions should preclude appellees from raising this question for the first time on appeal, we feel that the issue should be decided.

The appellees' reliance on Cudahy Packing Co. of Louisiana v. Holland, 315 U.S. 357, 62 S.Ct. 651, 86 L.Ed. 895 (1942), is entirely misplaced. That case involved an entirely different statute, the legislative history of which demonstrated a Congressional intent not to permit a delegation of the power to sign and issue subpoenas. That the *Cudahy* decision must be applied within narrow limits is made clear by Fleming v. Mohawk Wrecking & Lbr. Co., 331 U.S. 111, 67 S.Ct. 1129, 91 L.Ed. 1375 (1947). The rule making power of the Secretary under the Packers and Stockyards Act[8] is as broad as the power under scrutiny in *Fleming,* and much broader than the limited powers granted in *Cudahy.* It is interesting to note that Mr. Justice Douglas, who wrote the dissenting opinion in *Cudahy,* was the author of the court's unanimous opinion in *Fleming.*

The erosion of *Cudahy,* commenced in *Fleming,* was completed by the Reorganization Act of 1949, 5 U.S.C. § 133z—133z–15. The Act, applicable to all agencies, included provisions authorizing any officer of a Government agency to delegate any of his functions. 5 U.S.C. § 133z–1, Reorganization Plan No. 2 of 1953, 67 Fed.Stat. 633, 5 U.S.C. § 511, 18 F.R. 3219 (June 4, 1953), placed the

---

7. "The subpoena *duces tecum* seeks to compel the production of all records of this corporation for the period stated, which would include those records relating to the acquisitions of day-old chicks *and those records made or kept with reference to the raising or growing of* *said chicks into broilers,* and such records are clearly beyond the authority of the Secretary of Agriculture to compel." (From Applications.) (Emphasis supplied.)

8. 7 U.S.C. § 228.

entire administration of the Department of Agriculture[9] in the Secretary and specifically provided that the Secretary might delegate any duty to any other officer or employee of the Department. The Secretary, pursuant to this legislation, assigned his functions under the Packers and Stockyards Act to the Administrator of the Agricultural Marketing Service, including authority to redelegate. The Administrator of the Agricultural Marketing Service delegated authority to perform the functions of administering the Packers and Stockyards Act to the Director of the Packers and Stockyards Division, including the power of redelegation. 28 F.R. 496, Sec. 5(h) and (n) (January 18, 1963). We conclude that the subpoenas were properly signed by the Acting Director of the Packers and Stockyards Division.

The orders of the district court quashing the service of the respective subpoenas are set aside and the causes are remanded for further proceedings in conformity with this opinion and in compliance with the Act.

---

9. With exceptions which are here not relevant.