**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**PERDUE FARMS, INC. and Franklin P. Perdue, Defendants-Appellants.**

**No. 687, Docket 81–6200.**

United States Court of Appeals,
Second Circuit.

Argued Feb. 8, 1982.
Decided May 20, 1982.

Roger A. Clark, Washington, D. C. (James V. Ryan, New York City, George C. Smith, Rogers & Wells, Washington, D. C., of counsel) for defendants-appellants.

Stephen E. Hart, U. S. Dept. of Justice, Civ. Div., Washington, D. C. (J. Paul McGrath, Asst. Atty. Gen., Washington, D. C., Edward R. Korman, U. S. Atty., E. D. N. Y., Brooklyn, N. Y., R. John Seibert, Dept. of Justice, Raymond Fullerton, Miriam Bender, Thomas C. Heinz, U. S. Dept. of Agriculture, Washington, D. C., of counsel) for plaintiff-appellee.

James F. Rill, Washington, D. C. (Kathleen E. McDermott, Gary J. Kushner, Collier, Shannon, Rill & Stott, Washington, D. C. and Weil, Gotshal & Manges, New York City, of counsel) for amicus curiae National Broiler Council.

Before OAKES, NEWMAN and PIERCE, Circuit Judges.

PIERCE, Circuit Judge:

■ This interlocutory appeal arises from a civil action brought by the United States under the Packers and Stockyards Act (the "Act"), 7 U.S.C. § 181 et seq., against Perdue Farms, Inc. and its chairman of the board, Franklin P. Perdue.[1] The government seeks declaratory and injunctive relief with regard to Perdue's wholesale marketing of dressed, ready-to-cook poultry in the New York City metropolitan area. Chief Judge Jack B. Weinstein, United States District Court for the Eastern District of New York, denied Perdue's motion to dismiss or for summary judgment, ruling that Perdue is a "live poultry dealer" under the Act and that, as such, its sale of slaughtered poultry is covered by § 202 of the Act, 7 U.S.C. § 192, which proscribes certain anticompetitive trade practices. The district court certified, and we accepted, for interlocutory review pursuant to 28 U.S.C. § 1292(b) the following controlling question:

> "[W]hether the provisions of § 202 of the [Act] are applicable to acts or practices relating solely to the sale of slaughtered poultry by an integrated poultry producer that also sells some live poultry . . ."

Order filed July 23, 1981 at 2. Because Perdue's sale of slaughtered poultry is covered by the literal language of the Act and there is an absence of convincing proof showing that Congress did not intend the plain meaning of the statutory words it chose, we answer the certified question in the positive and affirm the ruling of the district court.

## I.

The pertinent facts, stipulated for purposes of this appeal, indicate that Perdue is a vertically integrated poultry producer. Perdue owns its own breeder flocks for egg production and operates its own hatcheries. Its chickens are raised on growing farms for which Perdue provides its own feed and veterinary services. The chickens are slaughtered, processed, and ice-packed at Perdue's processing plants. Perdue sells the slaughtered and dressed poultry under its "Perdue" brand name to wholesale distributors and to large retail grocery chains.

"Because it is extremely difficult to predict accurately the market for its fresh-killed poultry six to eight weeks in advance, which is the normal growing cycle for Perdue broilers, Perdue periodically [has] excess live broilers on hand which it cannot economically process without spoilage or waste. When Perdue has excess live broilers, it sells [them] either directly or through a broker to other processors. No live broilers are sold to wholesalers, retailers or other distributors for sale to consumers." Stipulation, ¶ 5, Joint Appendix 41. Perdue also sells live a portion of its "spent" breeder hens and cockerels to a broker that specializes in that type of poultry. During the fiscal year ending March 29, 1981, Perdue sold live poultry for approximately $1.8 million, which amounted to approximately 0.4 percent of Perdue's total poultry sales. In the preceding fiscal year, Perdue also sold live poultry for $1.8 million, amounting to 0.5 percent of its total poultry sales.

The government's complaint alleges that Perdue is "the dominant seller of premium-priced, advertised, branded, poultry and poultry products shipped packed in ice" in the New York City metropolitan area. The gravamen of the government's complaint is that Perdue has threatened to discontinue selling its poultry to distributors that continued to sell other branded poultry which competes with Perdue and that Perdue has carried out this threat.

The complaint alleges that Perdue's acts and practices "constitute unfair, unjustly discriminatory or deceptive practices" in violation of § 202(a) of the Act, 7 U.S.C. § 192(a), and were "engaged in for the purpose or with the effect of restraining

---

1. For the sake of convenience only, the corporate and individual defendants will be referred to collectively and in the singular as "Perdue."

commerce" in violation of § 202(e) of the Act, 7 U.S.C. § 192(e). The government alleges § 202 jurisdiction over Perdue by virtue of Perdue's status as a "live poultry dealer or handler" as used in the Act.

## II.

Sections 202(a) and (e) of the Act, 7 U.S.C. § 192(a) & (e), state:

It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

\* \* \* \* \* \*

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce.

Section 503 of the Act, 7 U.S.C. § 218b, defines "live poultry dealer" as "any person engaged in the business of buying or selling live poultry in commerce for purposes of slaughter either on his own account or as the employee or agent of the vendor or purchaser."

If the language of § 202 irrelevant to poultry is eliminated and the pertinent portion of the "live poultry dealer" definition of § 503 is substituted for the words "live poultry dealer", the introductory language of § 202 then reads: "It shall be unlawful with respect to ... poultry, or poultry products for any person engaged in the business of ... selling live poultry in commerce for purposes of slaughter ... or any live poultry handler to [engage in specified practices]." There is no question that Perdue sells some live poultry; and the term "poultry or poultry products" clearly encompasses slaughtered, ready-to-cook poultry. Thus, under the foregoing literal interpretation of the Act, Perdue's alleged practices concerning the wholesale market-

ing of slaughtered, ready-to-cook poultry are covered by § 202.

The issue before us is whether we should adhere to this literal reading of the statute—as did the district court—or depart from that interpretation. Perdue and amicus curiae, National Broiler Council, urge us to depart from the literal meaning of the statute on the grounds that (1) the legislative history and administrative interpretation of the Act indicate that Congress never intended the Act to cover the sale of slaughtered poultry by live poultry dealers and (2) even if Congress did envision such coverage, Perdue is not a live poultry dealer because only a very small portion of its business concerns the sale of live poultry. These two contentions will be considered in turn.

## III.

### A.

■ In construing a statute, the language chosen by Congress is the usual starting point. *Watt v. Alaska*, 451 U.S. 259, 265, 101 S.Ct. 1673, 1677, 68 L.Ed.2d 80 (1981). But because the chosen words are not in all instances a reliable indicator of Congress' intent, we may look to the legislative history of the enactment to determine whether literal application of the statute would "pervert its manifest purpose." *In re Adamo*, 619 F.2d 216, 222 (2d Cir.), *cert. denied*, 449 U.S. 843, 101 S.Ct. 125, 66 L.Ed.2d 52 (1980). *See, e.g., Watt v. Alaska*, 451 U.S. at 266, 101 S.Ct. at 1677–78; *United States v. Monia*, 317 U.S. 424, 431–32, 63 S.Ct. 409, 412–13, 87 L.Ed. 376 (1943) (Frankfurter, J., dissenting); *Viacom International v. FCC*, 672 F.2d 1034 at 1039–40 (2d Cir. 1982); *Cabell v. Markham*, 148 F.2d 737, 739 (2d Cir.) (L. Hand, J.), *aff'd*, 326 U.S. 404, 66 S.Ct. 193, 90 L.Ed. 165 (1945). Accordingly, we turn to the relevant legislative history of the Act.

As originally enacted in 1921, the purpose of the Packers and Stockyards Act was to combat anticompetitive and unfair practices in the highly concentrated meat packing industry. *See* H.R.Rep.No.77, 67th Cong. 1st Sess. (1921); *Stafford v. Wallace*, 258 U.S. 495, 499–501, 514–15, 42 S.Ct. 397, 399–

400, 401–02, 66 L.Ed. 735 (1922). Section 202 of the original Act made it unlawful for any "packer" to engage in any anticompetitive, monopolistic, discriminatory, or deceptive practices.[2] The definition of "packer" included any person engaged in the business of marketing poultry or poultry products, but only if that person also bought livestock for slaughter or manufacture or prepared meat or meat products for sale.[3]

In 1934, Senator Copeland from New York proposed an amendment to the Act aimed at certain racketeering practices concerning the sale of live poultry primarily in large urban areas such as New York City. 78 Cong.Rec. 451–52 (1934). The original proposal, S. 2246, would have attacked the problem by making a "poultry dealer" equivalent to a "packer". The bill defined "poultry dealer" as "any person engaged in the business (a) of buying or selling poultry in commerce for purposes of slaughter or (b) of manufacturing or preparing poultry or poultry products for sale or shipment in commerce." 78 Cong.Rec. 457 (1934) (text of bill).

2.  Section 202 of the original Act, Pub.L.No.51, § 202, 42 Stat. 159, 161 (1921), stated in full:
    It shall be unlawful for any packer to:
    (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device in commerce; or
    (b) Make or give, in commerce, any undue or unreasonable preference or advantage to any particular person or locality in any respect whatsoever, or subject, in commerce, any particular person or locality to any undue or unreasonable prejudice or disadvantage in any respect whatsoever; or
    (c) Sell or otherwise transfer to or for any other packer, or buy or otherwise receive from or for any other packer, any article for the purpose or with the effect of apportioning the supply in commerce between any such packers, if such apportionment has the tendency or effect of restraining commerce or of creating a monopoly in commerce; or
    (d) Sell or otherwise transfer to or for any other person, or buy or otherwise receive from or for any other person, any article for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or
    (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices in commerce, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article in commerce, or of restraining commerce; or
    (f) Conspire, combine, agree, or arrange with any other person (1) to apportion territory for carrying on business in commerce, or (2) to apportion purchases or sales of any article in commerce, or (3) to manipulate or control prices in commerce; or
    (g) Conspire, combine, agree or arrange with any other person to do, or aid or abet the doing of, any act made unlawful by subdivision (a), (b), (c), (d), or (e).

3.  Section 201 of the original Act, Pub.L.No.51, § 201, 42 Stat. 159, 160–61 (1921), defined "packer" as follows:

    When used in this Act—The term "packer" means any person engaged in the business (a) of buying live stock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of manufacturing or preparing live-stock products for sale or shipment in commerce, or (d) of marketing meats, meat food products, live-stock products, dairy products, poultry, poultry products, or eggs, in commerce; but no person engaged in such business of manufacturing or preparing live-stock products or in such marketing business shall be considered a packer unless—
    (1) Such person is also engaged in any business referred to in clause (a) or (b) above, unless
    (2) Such person owns or controls, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, any interest in any business referred to in clause (a) or (b) above, or unless
    (3) Any interest in such business of manufacturing or preparing live-stock products, or in such marketing business is owned or controlled, directly or indirectly, through stock ownership or control or otherwise, by himself or through his agents, servants, or employees, by any person engaged in any business referred to in clause (a) or (b) above, or unless
    (4) Any person or persons jointly or severally, directly or indirectly, through stock ownership or control or otherwise, by themselves or through their agents, servants, or employees, own or control in the aggregate 20 per centum or more of the voting power or control in such business of manufacturing or preparing live-stock products, or in such marketing business and also 20 per centum or more of such power or control in any business referred to in clause (a) or (b) above.

The bill which was eventually enacted, S. 12, was much more particular in regulating only "live poultry dealers and handlers." *See* Pub.L.No.272, 49 Stat. 648 (1935). The amending legislation began with an introductory section, § 501, 7 U.S.C. § 218, which clearly articulated the purpose of the legislation:

> The handling of the great volume of live poultry required as an article of food for inhabitants of large centers of population is attendant with various unfair, deceptive, and fraudulent practices and devices, resulting in the producers sustaining sundry losses and receiving prices far below the reasonable value of their live poultry in comparison with prices of other commodities and in unduly and arbitrarily enhancing the cost to consumers. Such practices and devices are an undue restraint and unjust burden upon interstate commerce and are a matter of such grave concern to the industry and the public as to make it imperative that steps be taken to free such commerce from such burden and restraint and to protect producers and consumers against such practices and devices.

This same particularized purpose is reflected in the pertinent legislative history of the amendment. *See* S.Rep.No.487, 74th Cong., 1st Sess. (1935); 79 Cong.Rec. 12592–94 (1935); 79 Cong.Rec. 8294–95 (1935).

The enactment defined "live poultry dealer" as it presently appears in the Act, 7 U.S.C. § 218b, i.e., as "any person engaged in the business of buying or selling live poultry in commerce." The amendment further provided that the words "or any live poultry dealer or handler" [4] follow the word "packer" in various sections of the Act, including § 202. Thus, after the 1935 amendments, § 202(a) and (e) read:

It shall be unlawful for any packer or any live poultry dealer or handler to:

(a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or

\*   \*   \*   \*   \*   \*

(e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce.

In 1957, bills were introduced in both houses of Congress which proposed to amend the Act primarily for purposes of altering or clarifying the respective regulatory responsibilities of the United States Department of Agriculture ("USDA") and the Federal Trade Commission ("FTC"). On August 9, 1957, the House Committee on Agriculture reported a bill, H.R. 9020, which provided for USDA jurisdiction over the activities of packers and live poultry dealers relating to livestock, meats, meat food products, livestock products in unmanufactured form, poultry and poultry products. All other activities of packers and live poultry dealers were placed under the FTC's jurisdiction. H.R.Rep.No.1048, 85th Cong., 1st Sess. 4, *reprinted in* [1958] U.S. Code Cong. & Ad.News 5212, 5216.[5]

In the meantime, the Senate Judiciary Committee reported a bill, S. 1356, which fully stripped the USDA of its jurisdiction over unfair trade practices in the meatpacking and poultry industries and transferred that responsibility to the FTC. The proposed amendment was prompted by concern

---

**4.** "Live poultry handler" is not defined in the statute, but could reasonably be interpreted to include those persons referred to in § 502 of the Act, 7 U.S.C. § 218a, i.e., those who feed, water, hold, deliver, ship, weigh, unload, load on trucks, truck or handle live poultry in commerce. Because we find that Perdue's slaughtered poultry sales as a live poultry dealer are covered by the Act, we need not determine whether Perdue is a live poultry handler under the Act.

**5.** The report explains:

> "While retaining the existing definition of a packer, the bill amends the act so that jurisdiction is predicated not upon the mere fact that a person or firm may fall within the definition of a packer but upon the type of activity carried on by such person."

H.R.Rep.No.1048, 85th Cong., 1st Sess. 6, *reprinted in* [1958] U.S.Code Cong. & Ad.News 5212, 5218.

that (1) the USDA had not been adequately enforcing the unfair trade provisions of the Act, including § 202 and (2) that many firms normally within the FTC's jurisdiction had been escaping the Commission's reach by acquiring a business which gave them "packer" status and the concomitant exemption from FTC regulation. S.Rep. No.704, 85th Cong., 1st Sess. 3–4 (1957). After brief debate on the floor of the Senate, during which there was no discussion of poultry, 104 Cong.Rec. 5036–40 (1958), S. 1356 was referred to the Committees on the Judiciary and Agriculture and Forestry. 104 Cong.Rec. 5074–75 (1958). Those committees reported a new version of S. 1356 which proposed that the USDA have exclusive jurisdiction with respect to livestock and poultry through the packing plant and share concurrent jurisdiction with the FTC with respect to meats and poultry products after they had been prepared for distribution. S.Rep.No.1464, 85th Cong., 2d Sess. 4 (1958). Following a lengthy debate, during which the bill's effect upon poultry and live poultry dealers was not discussed, the Senate approved S. 1356. 104 Cong.Rec. 8820–42 (1958).

On August 12, 1958, the House passed its own proposal, H.R. 9020, rather than acting upon the Senate's bill. As in the Senate, the effect upon poultry and live poultry dealers was not explicitly discussed. 104 Cong.Rec. 17179–89 (1958). Ten days later, the Senate passed the House proposal with very little debate. 104 Cong.Rec. 19101 (1958). To effectuate its purpose of limiting the USDA's unfair trade practice jurisdiction to certain activities, the new legislation amended § 202 of the Act by inserting after the word "unlawful" the words "with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products." Pub.L. No.85–909 § 1(1), 72 Stat. 1749 (1958). Thus, following the 1958 amendments, the pertinent portion of § 202 read:

> It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to:

> (a) Engage in or use any unfair, unjustly discriminatory, or deceptive practice or device; or
>
> \*　　\*　　\*　　\*　　\*　　\*
>
> (e) Engage in any course of business or do any act for the purpose or with the effect of manipulating or controlling prices, or of creating a monopoly in the acquisition of, buying, selling, or dealing in, any article, or of restraining commerce.

Since 1958, no amendment to the Act relevant to this case has been enacted.

From the foregoing legislative history Perdue wishes us to conclude that Congress never intended to cover the slaughtered poultry sales of live poultry dealers. We decline to do so. The Supreme Court has recently stressed that "in the absence of 'clear evidence,' *United States v. Apfelbaum*, 445 U.S. 115, 121, 100 S.Ct. 948, 952, 63 L.Ed.2d 250 (1980), of a 'clearly expressed legislative intention to the contrary,' *Consumer Product Safety Commission v. GTE Sylvania*, [447 U.S. 102, 108, 100 S.Ct. 2051, 2056, 64 L.Ed.2d 766 (1980)]", the plain language of a statute controls its construction. *Bread Political Action Committee v. Federal Election Committee*, —— U.S. ——, ——— ———, 102 S.Ct. 1235, 1237–40, 71 L.Ed.2d 432 (1982). *See also Ford Motor Credit Co. v. Cenance*, 452 U.S. 155, 158 n.3, 101 S.Ct. 2239, 2241 n.3, 68 L.Ed.2d 744 (1981) (per curiam). Since the language added in 1958 was inserted for the purpose of delineating the scope of the activities to be regulated when undertaken by the specified entities, it would take compelling evidence to justify departure from the terms Congress selected. Here, Perdue has failed to demonstrate through clear evidence Congress' intention not to include, in spite of the contrary statutory language added in 1958, the slaughtered poultry activities of live poultry dealers.

■ The most that can be garnered in Perdue's favor from the legislative history is (1) that the 1935 Congress did not pursue the original Senate proposal which would

have explicitly covered the marketing of slaughtered poultry by all companies, and (2) that the crucial language of the 1958 amendments, which brings live poultry dealers' activities "with respect to . . . poultry and poultry products" within the Act's ambit, was adopted without explicit discussion in the Congressional reports or debates. The failure to enact a provision which never reached the floor of the legislative body and the mere absence of discussion in the legislative history hardly reflects a "clearly expressed legislative intention" not to apply the plain meaning of the statute. As aptly put by the Supreme Court in *Gemsco, Inc. v. Walling,* 324 U.S. 244, 260, 65 S.Ct. 605, 614–15, 89 L.Ed. 921 (1945): "The plain words and meaning of a statute cannot be overcome by a legislative history which, through strained processes of deduction from events of wholly ambiguous significance, may furnish dubious bases for inference in every direction." Except where necessary to avoid an absurd result, *see Trans Alaska Pipeline Rate Cases,* 436 U.S. 631, 643, 98 S.Ct. 2053, 2061, 56 L.Ed.2d 591 (1978)—a situation not presented here—the court will not depart from the words chosen by Congress merely because there is a dearth of words in the legislative history which support the plain meaning of the statute.

The past administrative interpretation of the Act by the USDA is also of little help to Perdue in its attempt to avoid the literal language of the Act. The government has pointed us to only four prior instances in which the Act has been applied to the slaughtered poultry activities of live poultry dealers. In two of the cases, the respondents did not challenge the USDA's regulatory jurisdiction under the Act, *In re Clift C. Lane,* 26 Agric.Dec. 833 (1967); *In re Vinton Produce Co.,* 22 Agric. Dec. 799 (1963); and the other two cases merely involved court enforcement of USDA subpoenas, *United States v. Marshall Durbin & Co.,* 363 F.2d 1 (5th Cir. 1966); *United States v. Tyson's Poultry, Inc.,* 216 F.Supp. 53 (W.D.Ark.), *appeal dismissed,* 319 F.2d 860 (8th Cir. 1963). While this history of administrative actions directed at the slaughtered poultry activities of live poultry dealers might be characterized as meager, it does not justify an interpretation which would ignore the plain meaning of the statute. A contrary result, for which Perdue has cited no authority, would impermissibly subordinate Congress' intention as expressed in the statutory language to the vagaries of a scant history of agency interpretation. *See Mohasco Corp. v. Silver,* 447 U.S. 807, 825, 100 S.Ct. 2486, 2496, 65 L.Ed.2d 532 (1980) ("[Agency] 'interpretation' of a statute cannot supersede the language chosen by Congress.").[6]

In sum, Perdue has failed to clearly demonstrate through the Act's legislative history that Congress intended the Act's coverage to exclude the marketing of slaughtered poultry by live poultry dealers. Nor has Perdue shown a history of agency interpretation which indicates that § 202 of the Act does not reach the slaughtered poultry activities of live poultry dealers.

### B.

Perdue cannot avoid coverage of § 202 by virtue of the fact that only 0.5 percent of its business involves the sale of live poultry. Prior to 1957, Congress evinced no intention to exclude from the

---

**6.** The USDA's revocation in 1979 of its regulations, implemented pursuant to § 502 of the Act, 7 U.S.C. § 218a, concerning the licensing of live poultry dealers or handlers in designated areas is not probative of the USDA's § 202 jurisdiction over marketing practices. The abolition of the regulations merely shows that the marketing of live poultry in designated metropolitan areas had become "virtually nonexistent" and that "the regulations were no longer pertinent." 44 Fed.Reg. 45359 (August 2, 1979).

Similarly unavailing is Perdue's reliance upon two FTC advisory opinions, requested by poultry producers, concerning data collection and dissemination in the marketing of poultry. Advisory Opinion No. 205, 16 C.F.R. § 15.205; Advisory Opinion No. 303, 16 C.F.R. § 15.303. These opinions were issued in 1968 without an initial determination of whether the FTC had jurisdiction over the practices in issue under § 406 of the Act, 7 U.S.C. § 227, and thus are entitled to little weight.

Act's scope persons whose live poultry sales were minimal. In fact,. the 1935 amendments to the Act extended coverage of § 202 to "*any* live poultry dealer or handler." The report which accompanied the original 1957 Senate proposal to amend the Act indicates that the committee majority expressly rejected a proposal, endorsed by a minority of the committee members, to modify the definition of live poultry dealer and packer .so that only persons *principally* engaged in the business of buying or selling live poultry or meat packing would be covered by the Act. S.Rep.No.706, 85th Cong., 1st Sess. 31–32, 53 (1957). The committee minority's amendment was proposed as a solution to the regulatory problems created by firms that were avoiding the FTC's reach by acquiring a small firm which caused the entire company to become a packer or live poultry dealer. As previously discussed, the committee majority and the House of Representatives proposal which was eventually enacted by the full Congress chose to combat that problem by limiting the Act's coverage to certain enumerated *activities* of packers and live poultry dealers and handlers.

Thus, rather than focusing upon the absolute amount of packing business or live poultry business a firm engaged in, Congress chose to make the USDA's jurisdiction dependent upon the activity of the business. In this regard, the slaughtered poultry sales of live poultry dealers, no matter how small, were explicitly brought within the Act's ambit by the 1958 amendment to § 202. Perdue has failed to demonstrate a legislative history which requires us to depart from that language. Perdue's slaughtered poultry sales, therefore, are covered by § 202 of the Act, regardless of

the fact that its live poultry sales comprise only 0.5 percent of its gross sales.[7]

## IV.

■ Finally, Perdue claims that adherence to the literal meaning of the Act's language would create an incentive for vertically integrated poultry producers, in order to avoid categorization as a "live poultry dealer," to destroy rather than sell excess live broilers and spent breeders, thereby inducing economic inefficiency.[8] Regardless of how accurate this observation might be, "courts should not 'ignore the ordinary meaning of [the] plain language' of a statute, even though effectuating that meaning may have undesirable public policy ramifications," for to do so "would be to preempt congressional action by judicially decreeing what [the court believes] 'accords with some modicum of common sense and public weal.' " *Manchester Environmental Coalition v. EPA*, 612 F.2d 56, 60 (2d Cir. 1979), *quoting TVA v. Hill*, 437 U.S. 153, 173, 194, 98 S.Ct. 2279, 2291, 2302, 57 L.Ed.2d 117 (1978). This is particularly true since adoption of Perdue's proffered interpretation of the Act would place under § 202 the marketing of slaughtered poultry by packers but not the marketing of the same products by vertically integrated poultry firms—an apparently inequitable and administratively cumbersome result. In the circumstances of this case, the possible economic inefficiency claimed by Perdue and Congress' alleged drafting error are for Congress, not the courts, to resolve.

The certified question is answered in the affirmative and we affirm the order of the district court.

## NEWMAN, Circuit Judge, concurring:

7. *Crosse & Blackwell Co. v. FTC*, 262 F.2d 600 (4th Cir. 1959), upon which both parties heavily rely, simply emphasized that coverage under the Act should be premised upon a packer's *activity* rather than its mere *status* as a packer. As discussed above, the slaughtered poultry activities of live poultry dealers are expressly covered by § 202 of the Act.

8. Apparently underlying this argument is the claim that Congress could not possibly have intended its 1958 amendments to have an effect

upon the business of vertically integrated poultry producers. In addition to the fact that Perdue has failed to meet its burden of showing legislative history demonstrating that Congress did not intend such a result, we must assume that Congress was aware of what it accomplished when it amended the Act. *United States Railroad Retirement Board v. Fritz*, 449 U.S. 166, 179, 101 S.Ct. 453, 461, 66 L.Ed.2d 368 (1980).

Whether or not to apply the literal terms of a statute is a choice that will be with us as long as legislators enact laws and judges construe them. There is no automatically "right" way to decide. In some circumstances, literalness is a faithful deference to the legislative branch, preferable to unrestrained judicial lawmaking. In other circumstances, it is a wooden approach, properly displaced by creative judicial interpretation. The characterizations may describe what we have done, but they do not aid in deciding when to do it.

In this case, all members of the panel agree that the literal terms of § 202 of the Packers and Stockyards Act, as amended in 1958, apply to a live poultry dealer's activity with respect to poultry products. And no member of the panel contends that applying the statute literally would achieve a result plainly contrary to the evident Congressional purpose in enacting the 1958 amendments. That is to say, no one of us believes that Congress revised the statute in 1958 in order to make sure that live poultry dealers would *not* be subject to Department of Agriculture regulation with respect to poultry products. Thus, this is not the easy case where literalness should be rejected in order to avoid a result contrary to what the legislators sought to achieve.

Instead, this is a closer case in which a legislative intent to achieve one identifiable purpose may perhaps have been carried out by language unwittingly broader than necessary. By specifying a list of items in the introductory portion of § 202, Congress clearly intended to subject *meat packers* to Department of Agriculture regulation with respect to all items on the list, and to subject them to Federal Trade Commission jurisdiction with respect to any items not on the list. By making the list applicable to live poultry dealers, did Congress also intend to subject them to Department of Agriculture regulation with respect to all items on the list, including poultry products, or was such a result never contemplated? And, if never contemplated, would such a result have been rejected if it had occurred to the Congressional mind? I do not know, nor have I any especially firm basis for an educated guess.

I therefore examine the context in which the issue arises and note the following. The subject matter is business regulation. A formidable trade association, the National Broiler Council, can be expected to get the attention of the pertinent lawmakers if in fact Congress prefers not to regulate in the manner its chosen words specify. A literal application of the statute creates neither mischief nor a result that Congress manifestly would not have wanted if the prospect of such application had been considered. In these circumstances, I stay with the terms of the statute, especially when those terms were selected in an effort to resolve the very type of issue this case presents, the allocation of jurisdiction between two regulatory agencies.

OAKES, Circuit Judge (dissenting):

I realize that the era of purposive interpretation of Acts of Congress may be at an end, and a new era of literalism at hand. The view may no longer prevail that "[t]here is no surer way to misread any document than to read it literally" and that "although [Congress's] words are by far the most decisive evidence of what they would have done, they are by no means final." *Guiseppi v. Walling*, 144 F.2d 608, 624 (2d Cir. 1944) (L. Hand, J., concurring), *aff'd sub nom. Gemsco, Inc. v. Walling*, 324 U.S. 244, 65 S.Ct. 605, 89 L.Ed. 921 (1945). We are now urged instead to pay "strict adherence" to Congress's chosen words. *Mohasco Corp. v. Silver*, 447 U.S. 807, 826, 100 S.Ct. 2486, 2497, 65 L.Ed.2d 532 (1980). *See generally* Note, *Intent, Clear Statements, and the Common Law: Statutory Interpretation in the Supreme Court*, 95 Harv.L.Rev. 892 (1982). I nevertheless dissent.

Our task here is to determine which administrative agency—the Department of Agriculture or the Federal Trade Commission—was intended by Congress to have jurisdiction over alleged unfair practices in

Perdue's sale of slaughtered poultry.[1] The statute at hand provides for USDA jurisdiction over "*live* poultry dealer[s] or handler[s]" (emphasis added). Jurisdiction over a company dealing solely in slaughtered poultry is left to the FTC. Perdue deals primarily but not solely in slaughtered poultry. Its only live poultry business, worth $2 million a year or 0.5% of total annual sales, is selling excess live broilers and "spent" breeder hens and cockerels. Unlike the majority, I read the statute to extend USDA jurisdiction over Perdue's live poultry business, but not beyond that to its business in slaughtered and dressed poultry and poultry products. Nothing in the legislative history, the case law, or past administrative interpretation leads me to believe that the sale of one live chicken subjects a dealer to USDA jurisdiction over all his poultry products.

As the majority concedes, the legislative history of the 1935 amendments to the Packers and Stockyards Act reveals that Congress specifically declined to extend the Act's coverage to all poultry dealers. Proposed language that would have covered producers of slaughtered poultry, *see* 78 Cong.Rec. 457 (1934), was omitted from section 503 of the Act when the amendments were enacted, *see* 7 U.S.C. § 218b. The amendments, aimed at protecting producers as well as consumers from racketeering in the live poultry market, extended the Act only to "live poultry dealers." *See* S.Rep.No. 487, 74th Cong., 1st Sess. (1935); 79 Cong.Rec. 12593 (1935). The legislative purpose, as codified in section 501 of the Act as amended, was to eliminate unfair and deceptive practices in "[t]he handling of the great volume of *live poultry*" 7 U.S.C. § 218 (emphasis added). Nothing in the 1935 amendments indicates congressional intent to apply the Packers and Stockyards Act to slaughtered poultry production.

The majority rests its interpretation on the language of the 1958 amendments to the Act.[2] Prior to 1958, the introductory language of section 202 read:

1. The Government's complaint relates only to Perdue's "business of selling dressed, ready-to-cook poultry and poultry products," not to Perdue's live poultry business.

2. The majority, however, does not adopt two of the Government's other arguments which I find overly expansive. The first argument, that Perdue is "engaged in the business of buying" live poultry, 7 U.S.C. § 218b, when it "receives" its own poultry from its contract growers, is untenable, since Perdue is not then "buying" poultry.

The second argument, that Perdue is a "handler" as to all its dressed poultry, would reduce the defined terms "poultry dealer" to surplusage. The term "handler" referred to shippers, "coopsters," and other middlemen involved in the racketeering aimed at by the 1935 amendment. Senator Copeland of New York had this to say when he introduced the bill:

There is in my city of New York a very large Jewish and Italian population. With those people there is a demand for *live* poultry. A housewife goes to the poultry market and selects the bird and has it killed in her presence. That industry is so great that it amounts to about $200,000,000 a year in New York City, so it can be seen that it is a tremendous business.

\* \* \* \* \* \*

The poultry is brought from the West in special cars, "Pullman palace cars" for poultry. When the poultry is unloaded from the cars in Jersey City, the birds are put into wooden coops, which are very cheap affairs, I suppose can be made for $2. They are loaded on trucks, the trucks are taken across on the ferry to the West Washington Market, or some other market, and there they are unloaded.

In order to get those birds from the car they have to be put into coops, which are rented from a concern having a monopoly, and $1 per trip is charged for them. In order to fill the coop, two men are employed, and then to lift the coop from the platform to the truck, two other men are employed, and the truck must be one which is owned by the monopoly controlling the transportation of *live* poultry. After the poultry gets across the ferry, two men must be employed to lift the coop off the truck to the sidewalk.

It costs $321 for the 5 days consumed in the transportation of a carload of poultry from Iowa to Jersey City. It costs $387 to unload that poultry in Jersey City and deliver it from Jersey City over to New York, which operation takes 5 hours. The cost of the transaction has been more than doubled by reason of the excessive charges made through these methods demanded in the *handling* of the poultry in the terminal. If they do not hire the right truck and use the right coops the poultry will never reach its destination in salable condition. The poultry racket

It shall be unlawful for any packer or any live poultry dealer or handler to: . . . [prohibited practices enumerated].

The 1958 amendments changed that language to read:

It shall be unlawful with respect to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products for any packer or any live poultry dealer or handler to: . . . [prohibited practices enumerated].

7 U.S.C. § 192. The majority reasons that "[t]here is no question that Perdue sells some live poultry; and the term 'poultry or poultry products' clearly encompasses slaughtered, ready-to-cook poultry. Thus, under the foregoing literal interpretation of the Act, Perdue's alleged practices concerning the wholesale marketing of slaughtered, ready-to-cook poultry are covered by § 202." After scanning the legislative history of the amendments the majority concludes that "Perdue has failed to demonstrate through clear evidence Congress' intention not to include, in spite of the contrary statutory language added in 1958, the slaughtered poultry activities of live poultry dealers." I take a different view.

The 1958 amendments were not in the least addressed to live poultry dealers or handlers. They were intended to resolve a debate about how to divide jurisdiction over packers between the FTC and the USDA. The Act had previously given the USDA sole jurisdiction over persons subject to the Act, and explicitly denied the FTC any jurisdiction except as requested by the USDA. Persons subject to the Act included "packers" as defined in section 201.[3] The 1958 amendments predicated jurisdiction on the activities rather than the persons covered in order to ensure that USDA jurisdiction over

"packers" would not extend beyond the activities enumerated in the statutory definition of a "packer" to packers' other unrelated activities. The House Report on the amendments explained:

Under the present provisions of the Packers and Stockyards Act jurisdiction [over packers] is predicated entirely upon the "person." The term "packer" is defined in section 201 of the act and any person or firm who falls within this definition is under the jurisdiction of the act and, therefore, of the Secretary of Agriculture with respect to all his activities, in interstate commerce whether or not they are directly related to the slaughter, processing, and marketing of livestock. *While retaining the existing definition of a packer, the bill amends the act so that jurisdiction is predicated not upon the mere fact that a person or firm may fall within the definition of a packer but upon the type of activity carried on by such person.* The bill limits the jurisdiction of the act and, therefore, of the Secretary of Agriculture to those commodities specifically listed in paragraph (1): "livestock, meats, meat food products, livestock products in unmanufactured form, poultry, or poultry products." Activities of *packers* with respect to all other products will fall under the jurisdiction of the Federal Trade Commission.

This basic change in the jurisdiction of the act is reflected in section 3 where a change is made in the Federal Trade Commission Act to change the reference there from "persons, partnerships, or corporations subject to the Packers and Stockyards Act" to "*matters* made subject to the Packers and Stockyards Act".

---

has become one of the most outrageously dishonest and corrupt and vile industries known to the criminal world.

78 Cong.Rec. 451–52 (1934) (emphasis added).

**3.** Section 201 of the Act, 7 U.S.C. § 191, which remained unchanged until 1976, provided as follows:

§ 191. "Packer" defined

When used in this chapter—

The term "packer" means any person engaged in the business (a) of buying livestock in commerce for purposes of slaughter, or (b) of manufacturing or preparing meats or meat food products for sale or shipment in commerce, or (c) of manufacturing or preparing livestock products for sale or shipment in commerce, or (d) of marketing meats, meat food products, livestock products, dairy products, poultry, poultry products, or eggs, in commerce . . . .

H.R.Rep.No. 1048, 85th Cong., 2d Sess. 5–6 (1957), *reprinted in* [1958] U.S.Code Cong. & Ad.News 5212, 5217–18 (emphasis added).

By incorporating into section 202 the words "poultry" and "poultry products" that previously had been embodied in the definition of a "packer," Congress thus did not intend to expend USDA jurisdiction over live poultry dealers. Congress's sole intent was to clarify and limit USDA jurisdiction over packers, leaving to the FTC jurisdiction over nonpacking activities engaged in by packers.[4] There is nothing in this legislative history to negate the inference that Congress similarly intended the USDA to exercise jurisdiction over the live poultry activities—defined in section 503 of the Act as "buying or selling live poultry in commerce for purposes of slaughter," 7 U.S.C. § 218b—of "live poultry dealers," while jurisdiction over the unrelated activities of "live poultry dealers" would remain with the FTC.

The applicable case law supports this more limited reading of the Act. Even before the 1958 amendments, courts found that packers were not subject to USDA jurisdiction for activities not integral to their packing operations. In *Crosse & Blackwell Co. v. FTC*, 262 F.2d 600, 606 (4th Cir. 1959), the Fourth Circuit found that "a canner of miscellaneous products is so far removed from [the business] of the packing industry, upon which the attention of Congress was focused, that it may be said to have been reached by the [Packers and Stockyards] Act, if at all, only to the extent it is actually concerned with the processing of meats." The court observed that "it was never intended that relatively inconsequential activity which might be classified as meat packing should insulate all of the other activities of a corporation from the reach of the Federal Trade Commission." *Id.* at 605. *See also Safeway Stores, Inc. v. Freeman*, 244 F.Supp. 779, 781 (D.D.C.1965) (supermarket chain held subject to USDA jurisdiction under the Packers and Stockyards Act only to the extent that it actually engaged in the specific activities covered by the Act, but otherwise subject to FTC jurisdiction), *aff'd*, 369 F.2d 952 (D.C.Cir.1966).

To be sure, I put not much stock in subsequent negative legislative history. The fact that Congress has several times rejected amendments which would clearly bring integrated poultry producers like Perdue within the Act does indicate, however, that some people at least think they are not now included except to the extent of their live poultry sales, if any. *See, e.g.*, H.R. 7527, 89th Cong., 1st Sess. (1965); S. 2879, 90th Cong., 2d Sess. (1968); H.R. 12668, 91st Cong., 1st Sess. (1969); H.R. 13704, 91st Cong., 1st Sess. (1969); H.R. 5493, H.R. 6690, S. 1532, H.R. 8410, 94th Cong., 1st Sess. (1975).

As for administrative construction of the statute, this is the first case in which the Secretary has asserted jurisdiction over an integrated poultry producer under the 1958 amendments to the Packers and Stockyards Act. Yet these producers have had a major share of the market since the early 1960s. National Commission on Food Marketing, *Organization and Competition in the Poultry and Egg Industries*, Tech. Study No. 2 (1966). Nothing in the Code of Federal

---

**4.** The House Report described the specific changes embodied in the 1958 amendments as follows:

> (1) There is a clear delineation between the Secretary of Agriculture and the Federal Trade Commission with respect to their jurisdiction over meatpackers with separate areas of responsibility designated.
>
> (2) The Secretary of Agriculture will have jurisdiction over and responsibility for those *activities of packers* relating to livestock, meats, meat food products, livestock products in unmanufactured form, poultry, and poultry products.

> (3) All other activities of packers will be under the jurisdiction and responsibility of the Federal Trade Commission.
>
> (4) Chain stores and other firms or persons engaged only incidentally in the meat packing or processing business will be subject to the trade practice provisions of the Packers and Stockyards Act only to the extent that they are engaged in meatpacking or some other operation falling within the specific responsibility of the Secretary of Agriculture under the act.

H.R.Rep.No.1048, 85th Cong., 2d Sess. 4, *reprinted in* [1958] U.S.Code Cong. & Ad.News 5212, 5216 (emphasis added).

Regulations would apply the Act to them, except to the extent they are actually dealing or handling live poultry or live poultry products.

I believe, in short, that the expansive reading of the Act and its amendments to cover activities never once mentioned in the legislative history, activities which concededly would not be covered were Perdue simply to slaughter and process its spent hens and cockerels and excess live broilers, was not within the congressional "purpose" or "intent." I still believe that somewhere in the realm of statutory interpretation these abstract concepts have a place, unless we are to attribute to Congress a precision and omniscience that makes the courts a useless appendage.